In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-1718

AUTOTECH TECHNOLOGIES LP,

*Plaintiff-Appellee,*

*v.*

INTEGRAL RESEARCH & DEVELOPMENT CORP.,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 3193—**David H. Coar**, *Judge.*

---

ARGUED FEBRUARY 6, 2007—DECIDED AUGUST 29, 2007

---

Before KANNE, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Integral Research & Development Corp. ("Integral") is a company wholly owned by the Belarusian government; Integral manufactures semiconductors. Autotech Technologies LP ("Autotech") filed an action against Integral in the U.S. district court for the Northern District of Illinois in 1996 for violating an exclusivity agreement that Autotech obtained through a third party, Digital Devices, Inc. ("DDI"); it also filed a similar suit in state court against DDI. Autotech, Integral, and DDI later reached a global settlement, which was reflected in orders entered by both courts on April 3, 1997

("Agreed Order"). The federal judgment stipulated that the court was retaining jurisdiction to enforce the Agreed Order. Disputes were not long in coming. A few months after the Order was entered, Autotech returned to the district court with a motion seeking contempt sanctions to enforce its exclusivity rights. The court found this appropriate and imposed a sanction of $5,000 per day. As far as anyone can tell, however, no one ever collected a penny of that money. Almost ten years later, Autotech sought and was granted an order reducing the accrued fines to a judgment for $18.8 million. The order did not stop the continuing accrual of the fines, but it included a writ of execution granting Autotech the right to seize Integral's assets, including those held by third parties.

On appeal, Integral raises a host of reasons why we should overturn the contempt judgment. Prominent among them is a challenge to the subject matter jurisdiction of the district court to entertain this contempt proceeding, because Integral is an instrumentality of a foreign state. See the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1601-11. We conclude, however, that subject matter jurisdiction is secure.

Some of Integral's other challenges hit their mark. First, Integral is entitled to pursue its attack now against the contempt finding underlying this huge judgment. Second, Autotech's failure properly to serve Integral with the motion for contempt deprived Integral of notice of the proceeding and, consequently, its right to a full and fair hearing. Third, the writ of execution issued in 2006 was defective, because it failed to identify specific properties in the United States against which the judgment could be executed. Finally, even if the service problem did not compel reversal of the contempt finding on its own, we would nonetheless reverse because Autotech failed to demonstrate that Integral was in contempt of the Agreed

Order, and it offered no competent proof supporting the sanction.

**I**

This case has its roots in an "Exclusive Sales Agreement" that DDI and Integral concluded in 1992. Their agreement made DDI the exclusive sales and marketing agent in the United States for Integral's products. In 1994, Autotech purchased from DDI the exclusive right to promote and sell Integral's products for resale or incorporation into products manufactured or sold in the United States; its authority was embodied in an "Exclusive Marketing Agreement." Integral authorized the transfer of rights from DDI to Autotech through an "Acknowledgment and Modification of Agreement." Relations between Autotech and Integral (as well as Autotech and DDI) soon soured. In 1996, Autotech filed a three-count suit in federal court against Integral, alleging breach of contract, fraud, and a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c). The complaint included demands for $200,000 for the contract claim and more than $10 million for the fraud and RICO claims. Integral filed two counterclaims for fraud and RICO violations, demanding $50,000 for the former and more than $19 million for the latter. Autotech filed parallel claims against DDI in state court. See *Autotech Technologies LP v. Digital Devices, Inc., et al.*, 95 CH 3427 (Ill. Cir. Ct., Cook County).

On April 3, 1997, Autotech and Integral agreed to dismiss the federal suit with prejudice, while allowing the court to retain jurisdiction to enforce the provisions of the Agreed Order. The state court suit was resolved similarly on the same day. The Agreed Order provided that Integral "shall not sell goods directly or indirectly in the United States[,] Canada, or to Mexican subcontractors

except any and all sales may be made by Integral through [Autotech]." Integral also promised not to use the Data Book compiled to market Integral's products. The Order further required that both Integral and the government of Belarus had to acknowledge the grant of exclusive rights. Finally, Autotech waived a $200,000 debt that Integral owed to it and agreed to transfer $217,000 to Integral after it received the required acknowledgments.

As Autotech saw it, this agreement worked no better than its predecessors. On December 2, 1997, Autotech filed a motion to find Integral in contempt of the Order. The only specific violation of the Order its motion alleged, however, was that Integral was selling goods to a company operated by Art Scornavacca. Autotech requested that Integral be fined $20,000 a day, submitting that "the imposition of this fine should have the effect of requiring Integral to comply with the Court's Order . . . ." No factual affidavit accompanied the motion for contempt. Autotech attached only a copy of the Agreed Order itself, acknowledgments of the Order signed by Integral's Vice-President of Sales and Marketing (Dmitry Vecher) and an official from the Ministry of Industry of the Republic of Belarus, a copy of a minute entry from November 8, 1996, and a letter from Vecher to one of Autotech's principals.

The last of these items, Vecher's letter, was evidently the foundation for Autotech's allegation that Integral was selling to Scornavacca. The letter suggests that Autotech and Integral had been discussing a set of five questions. The second of those questions related to Scornavacca. On that topic, Vecher wrote (somewhat elliptically), "We can provide with official confirmation of the binding necessity of the Agreement for sole agents. While have business with ordinary buyers (by the way, Mr. Scornavacca is one of them) making a buying/selling contract with them is sufficient, moreover that in this case the volumes of purchases ordered are scanty and do not influence the

situation at the market." This quote provides the only support for Autotech's assertion in its contempt motion that "Mr. Vecher ADMITS THAT INTEGRAL IS SELLING GOODS TO MR. SCORNAVACCA'S COMPANY." No record of service was attached to the motion. In its appearance in court on the motion on December 9, 1997, Autotech alleged only that it "served this on the embassy in Washington, D.C."

On the day of the hearing, the district court issued an Order for a Rule to Show Cause, returnable on December 23, 1997. Autotech had the responsibility of serving Integral. Back in court on December 23, Autotech's lawyer said only that "They were served by certified mail on December 12th. I have a copy of service or the original." He gave no details about who might have been served, and no document verifying the service was ever entered in the record. The court granted the motion for contempt, but it lowered the daily fine from the requested $20,000 to $5,000 a day out of concern that "[a] hundred days and we're up to $20 million." The fine began accruing on December 31, 1997. Autotech was ordered to "serve a copy of this Court's Order on Integral . . . and on the owner of Integral . . . , being the Republic of Belarus by its Embassy in Washington, D.C." Again, no record of service was ever made. (In its motion for a writ of execution filed on February 2, 2006, Autotech alleged that it had spoken with Integral's then-attorney John LaPine following the December 23, 1997 contempt order. No competent evidence of this conversation, in the form of an affidavit or otherwise, was ever made part of the record.)

Autotech's February 2, 2006, motion for a writ of execution submitted that the company had taken steps to discover and levy upon the assets of Integral in the United States, but that "[n]o such assets were discovered or levied upon." The motion explained that Autotech sought the writ of execution because it "believes there are assets

of Integral located in *other* countries that can be levied upon to satisfy at least a portion of the judgment debt owed to Plaintiff. . . . In order to levy upon these assets, Plaintiff must possess not only a certified copy of the judgment order . . . but also a Writ of Execution." (Emphasis added.) Yet again, the record contains no copy of service of this motion on Autotech.

The court granted Autotech's motion on February 10, 2006, without requiring from it any more information about the assets it hoped to attach. The court's writ read as follows:

> a. That Plaintiff, through its agents, is entitled to enforce and collect from third parties the judgment debt entered against Defendants on December 23, 1997, which amount is, as of January 31, 2006: $14,790,000, plus interest of 4.5% compounded annually, totaling $18,867,730, and which amount continues increasing at the rate of $5,000.00 per day plus interest;

> b. That those third parties that have, hold, or are in possession of goods or monies belonging to Integral [are] commanded to produce to Plaintiff or its agents all books, papers or records in their possession or control which may contain information concerning the property or income of, or indebtedness due Integral;

> c. That those third parties be prohibited from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to Integral or to which he [sic] may be entitled or which may be acquired by or become due to Integral and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to Integral, until further order of court or termination of the proceedings. . . . ;

d. That Plaintiff is allowed to levy upon and seize any and all assets of Integral held by, in the possession or control of, said third parties and, if said assets are not cash money, to sell said assets and convert them into cash money, and that Plaintiff is entitled to collect said assets and cash money as and for satisfaction of that portion of the judgment debt owed to it by Integral pursuant to the terms of the December 23, 1997 order.

In addition to the writ of execution, the court also reduced the accrued contempt monies to a judgment order "in the amount of $18,867,730." The order also noted that the issuance of the judgment order did not affect the further accrual of fines. Integral filed a notice of appeal from the judgment and the writ of execution on March 30, 2006.

## II

### A.  Subject Matter Jurisdiction

We begin, as we must, with the question of the district court's subject matter jurisdiction. For that purpose, we must look to the suit as a whole, and we must assess whether jurisdiction was proper as of the time the suit commenced. See *Grupo Dataflux v. Atlas Global Group, LP*, 541 U.S. 567, 570-71 (2004) (reaffirming time-of-filing rule, but noting also that certain actions after filing may cure an initial jurisdictional defect). Autotech filed this action against Integral in 1996. Because Integral, the defendant, was wholly owned by the government of Belarus, subject matter jurisdiction depended upon the application of the FSIA. This is because, as a corporate entity wholly owned by a foreign government, Integral falls within the FSIA's definition of the term "foreign state." See 28 U.S.C. § 1603(a), (b)(2); *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003). Autotech had alleged, erroneously,

that jurisdiction existed under 28 U.S.C. § 1332, the diversity and alienage statute. Section 1332 might support jurisdiction insofar as the case is against the two officers of Integral who were named in the complaint, but Autotech has furnished no information about the citizenship of its partners, and so we cannot be sure. In any event, because it has said nothing about their significance to the case on appeal, we consider that any arguments specific to them have been waived. Integral did not deny that jurisdiction was properly premised on diversity. Although normally parties cannot consent to federal jurisdiction, the FSIA presents a special case, as we discuss below. The statute makes immunity from suit the general rule for foreign states, see 28 U.S.C. § 1604, but, perhaps more importantly, § 1605 provides for exceptions from that general rule.

At least two of those exceptions readily apply to this litigation. The first, set out in § 1605(a)(1), is waiver; the other, found in § 1605(a)(2), is for commercial activities carried on in the United States, or carried on elsewhere with a direct effect in the United States. Several consequences flow from any decision that an exception to immunity applies: first, the district court has subject matter jurisdiction over the claim, 28 U.S.C. § 1330(a); second, it has personal jurisdiction over the state, 28 U.S.C. § 1330(b); and third, the foreign sovereign (or, as here, its instrumentality) must defend the case on the merits. See *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488-89 (1983). In a sense, then, in cases governed by § 1605(a)(1), this means that the voluntary act of waiver actually does confer jurisdiction on the district court, contrary to the usual rule. But the broader point of the statute, as *Verlinden* noted, is that it embodies a congressional determination that suits against foreign sovereigns inevitably implicate the foreign relations of the United States and thus "arise under" federal law. See *id.*

at 493. Thus, the waiver merely paves the way for the exercise of jurisdiction that Congress has determined is appropriate.

Integral never filed a piece of paper proclaiming that it was waiving its sovereign immunity, but it did so implicitly in a number of ways. It never raised an immunity defense prior to these contempt proceedings—not in a responsive pleading, not in any other motion, and not in the Agreed Order. Failing to raise sovereign immunity and then participating fully in a court proceeding amount to an implied waiver of immunity. See *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 10 F.3d 425, 432 (7th Cir. 1993) (holding that French-owned defendant "waived its objection to the jurisdiction of the Northern District of Illinois when it filed its counterclaim against [plaintiff] in that court without asserting that the court lacked jurisdiction" (citing RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 421(3) (1987))). Integral also signaled a waiver of its immunity by agreeing in its original contract with Digital Devices to arbitrate in the United States and by agreeing to a contract governed by Illinois law. See *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985) ("The legislative history of the FSIA gives . . . examples of cases in which courts have found implied waivers: . . . (2) a foreign state has agreed that a contract is governed by the law of a particular country; and (3) a foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity." (citing H. R. REP. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S. CODE CONG. & AD. NEWS 6604, 6617; S. REP. No. 1310, 94th Cong., 2d Sess. 18)). We conclude, therefore, that the district court had subject matter jurisdiction under § 1605(a)(1) because of Integral's waiver of its sovereign immunity.

Although it is unnecessary to reach Autotech's alternative argument that jurisdiction existed under the

commercial-acts exception of § 1605(a)(2), we note that this too applies here. The underlying contract was all about marketing Integral's products in the United States. It therefore deals with commercial activity undertaken in the United States of an instrumentality of a foreign sovereign. That is all that § 1605(a)(2) requires. This case does not require us to delve into the more complex question of when commercial activity outside the United States has a sufficiently direct domestic effect to come within the terms of the statute. See *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 617-20 (1992).

Perhaps realizing that it cannot show a lack of original jurisdiction in this case, Integral has offered a different argument for why jurisdiction is lacking here. It suggests that the FSIA does not authorize federal district courts to enter monetary contempt sanctions against foreign sovereigns. This rule, it asserts, implicates not just the kind of remedy the court may order, but the court's basic competence, even if the court has jurisdiction over the underlying suit. Integral argues that "absent a *clear and specific* waiver of sovereign immunity from *contempt* itself, a district court lacks the jurisdiction to enforce its orders through monetary contempt proceedings against a foreign sovereign."

We cannot accept this degree of fine-tuning. Once a court is entitled to exercise subject matter jurisdiction over the suit, it has the full panoply of powers necessary to bring that suit to resolution and to enforce whatever judgments it has entered. From our common-law ancestors forward, one of the most important of those powers is the power to punish contempt of court. See, *e.g.*, *Spallone v. United States*, 493 U.S. 265, 276 (1990) (reaffirming "axiom that 'courts have inherent power to enforce compliance with their lawful orders through civil contempt'" (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966));

*Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 794 (1987) ("[I]t is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders . . . ."). Nothing in the text of the FSIA comes close to suggesting that the FSIA was designed to abrogate or limit this essential power, or even that a separate jurisdictional showing is necessary for a contempt proceeding that arises within a case properly brought under the FSIA.

The structure of the FSIA itself refutes this idea. Jurisdiction (as well as immunity) is addressed in § 1604, which is captioned "Immunity of a foreign state from jurisdiction," and § 1605, captioned "General exceptions to the jurisdictional immunity of a foreign state." In contrast, later sections of the statute address various stages of a proceeding that has passed the jurisdictional hurdles. Sections 1609 and 1610 respectively outline the rules for "[i]mmunity from attachment and execution of the property of a foreign state" and "[e]xceptions" thereto. These sections delimit the scope of the district court's power to enter orders executing a judgment. They are, in the final analysis, nothing more than restrictions on the court's remedial and enforcement powers. Section 1609 says that, subject to certain exceptions, "the property in the United States of a foreign state shall be immune from attachment, arrest, and execution . . ."; section 1610(a) lists those exceptions, in effect indicating when the property of a foreign state may be attached in aid of execution on a judgment.

The cases that Integral has cited for the proposition that the court has no power to enter judgment against a foreign sovereign offer no support for its argument that a separate jurisdictional basis must exist for a contempt proceeding. It is true that the Fifth Circuit overturned the district court's issuance of a contempt order in *Af-Cap Inc. v. Republic of Congo*, 462 F.3d 417 (5th Cir. 2006), on the

ground that §§ 1610 and 1611 of FSIA did not provide for monetary sanctions as an "available method[ ] of attachment and execution against property of foreign states." *Id.* at 428. Whether or not we agree with the outcome of that case (which we have no occasion to consider here), it is plain that nothing in the opinion suggests that the Fifth Circuit thought that the flaw was a jurisdictional one. (One commentator from the State Department has opined otherwise, see Marian N. Leich, *Judicial Determinations of Immunity and Department of State's Role*, 81 AM. J. INT'L L. 643, 644 n.4 (1987) (commenting that the State Department's understanding of the FSIA "supported the position that jurisdiction for purposes of execution and attachment is not coextensive with jurisdiction to entertain an action"), but we can find no judicial authority for that proposition.) We would need much more clear guidance from Congress than we have before we could conclude that a court had no jurisdiction to entertain contempt proceedings in an action brought under the FSIA for which subject matter jurisdiction has been established.

### B. Appellate Jurisdiction

This appeal is from a proceeding that arose under the jurisdiction that the court retained in the Agreed Order to enforce its provisions. In these circumstances, we "treat the postjudgment proceeding as if it were a free-standing lawsuit and . . . identify the final decision in the postjudgment proceeding and confine any further appeal under section 1291 to that decision." *Bogard v. Wright*, 159 F.3d 1060, 1062 (7th Cir. 1998) (citations omitted). "A postfinal order will be treated as 'final' for purposes of section 1291 if it 'dispose[s] of all issues raised in the postjudgment motion.'" *JMS Development Co. v. Bulk Petroleum Corp.*, 337 F.3d 822, 825 (7th Cir. 2003) (quoting *Transportation Cybernetics, Inc. v. Forest Transit Com'n,*

950 F.2d 350, 352 (7th Cir. 1991)); see also *Motorola, Inc. v. Computer Displays Int'l, Inc.*, 739 F.2d 1149, 1154 (7th Cir. 1984) ("While it is true that most post-judgment orders are final decisions within the ambit of § 1291, not all are. To be final, the post-judgment order must still dispose completely of the issues raised.").

An order issued in post-judgment contempt proceedings may be appealable: "Contempt proceedings brought to enforce a final judgment are similar in most ways to other post-judgment proceedings. . . . Complete disposition of the contempt proceeding supports final judgment appeal, since there is no apparent opportunity for later review; appeal ordinarily is not available before complete disposition . . . ." 15B Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, *Fed. Prac. & Proc.* § 3917 (3d ed. 2000); see also *Szabo v. United States Marine Corp.*, 819 F.2d 714, 716 (7th Cir. 1987) ("[A]n order of civil contempt is appealable if and only if it is . . . final for purposes of section 1291 . . . ."). We accordingly have jurisdiction over the district court's entry of its judgment against Integral assessing a fine of $18,867,730. As we noted in *Motorola*, "[a]n order finding a party in civil contempt disposes of all of the issues raised only if it includes both a finding of contempt and the imposition of a sanction." 739 F.2d at 1154. Although this judgment may not resolve the underlying issue (Integral's refusal to abide by the judgment order), there would be no other time at which this order would be appealable, for Autotech has no obligation to wait for the resolution of any other issue to execute the order and attempt to collect on the judgment. We conclude, therefore, that Integral was entitled to take its appeal at this time.

**III**

Satisfied that there is federal subject matter jurisdiction over this suit and that we have appellate jurisdiction, we

may now turn to the remaining arguments in this case: whether Autotech properly served Integral in the contempt proceeding, whether the writ of execution was adequate, and whether Autotech made an adequate showing on the merits of its contempt motion.

## A. Service

This question is closely aligned to the issue of our appellate jurisdiction. Autotech argues that Integral should have appealed from the contempt order within 30 days of its entry on December 23, 1997. In principle, Integral could have done so. "A judgment establishing a system of coercive fines that will be exacted for future violations of a decree is final when entered; appeal can, and perhaps must, be taken at the time of entry without awaiting future contempt and actual imposition of the fines." 15B Wright, Miller, and Cooper, *Fed. Prac. & Proc.* § 3917. This means, in Autotech's view, that Integral is now barred from making any complaint about either the underlying finding of contempt or the accrual of the fines. Integral admits that this appeal is an attempt to collaterally attack the underlying 1997 contempt order. It argues that it may do so, however, because it was never properly notified about the contempt proceeding.

Before Integral can be barred either by law-of-the-case principles or something analogous to issue preclusion, it must have had a fair opportunity to be heard in the contempt proceeding. "Before finding a party in contempt, the district court must allow that party an 'opportunity to contest the issue.'" *United States v. Berg*, 20 F.3d 304, 310 (7th Cir. 1994) (quoting *Ferrell v. Pierce*, 785 F.2d 1372, 1383 (7th Cir. 1986)). As the Supreme Court has explained:

> [D]ue process of law as explained in . . . *Cooke* [*v.* *United States*, 267 U.S. 517 (1925)] requires that one

> charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation.

*In re Oliver*, 333 U.S. 257, 275 (1948). While *Oliver* was a criminal case, the notice requirement applies similarly in a civil case: "In a civil contempt case, due process requires that notice be given of the time and place of hearing." *American Fletcher Mortg. Co., Inc. v. Bass*, 688 F.2d 513, 519 (7th Cir. 1982); see also *E.E.O.C. v. Local 638*, 81 F.3d 1162, 1176 (2d Cir. 1996); *Remington Rand Corporation-Delaware v. Business Systems, Inc.*, 830 F.2d 1256, 1258 (3d Cir. 1987).

The question here is whether the notice given to Integral—service on the Belarusian ambassador—was sufficient both under the FSIA and for due process purposes. The FSIA contains specific rules for service of process, but it says nothing about service of later motions. Under FED. R. CIV. P. 4(j)(1), "Service [of process] upon a foreign state or a political subdivision, agency, or instrumentality thereof shall be effected pursuant to 28 U.S.C. § 1608." Section 1608, which is part of the FSIA, authorizes three methods for serving an agency or instrumentality of a foreign state:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accor-

dance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

> (A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

> (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

> (C) as directed by order of the court consistent with the law of the place where service is to be made.

28 U.S.C. § 1608(b).

Nothing in the FSIA explicitly requires that notice of a motion (even a motion for contempt) be given in accordance with the procedures for serving process. Although neither the Local Rules of the Northern District of Illinois nor the Federal Rules of Civil Procedure provide the notice standard for due process purposes, both supply relevant benchmarks for our inquiry. The Local Rules of the Northern District of Illinois generally require formal service of process for a contempt motion, providing that "[w]here the alleged contemnor has appeared in the action by an attorney, the notice of motion or order to show cause and the papers upon which it is based may be served upon that attorney; otherwise service shall be made personally, in the manner provided for by Federal Rule of Civil Procedure 4 for the service of a summons." N.D. ILL. LOCAL RULE § 18(A) (1997). This is more strin-

gent than the normal requirements for contempt proceedings in federal court, which are satisfied by service that conforms to FED. R. CIV. P. 5(b). See *Watkins v. Rives*, 125 F.2d 33, 40 (D.C. Cir. 1941); see also 4B Charles A. Wright and Arthur R. Miller, *Fed. Prac. & Proc.* § 1145 (3d ed. 2002) ("Direct service as required by Rule 4 for process is not required by Rule 5(b) since a civil contempt proceeding is an extension of the main action and personal jurisdiction need not be reasserted under Rule 4.").

Although we have not addressed the question, the Third Circuit has concluded that in evaluating whether notice was sufficient for due process in a civil contempt proceeding, the court should look to the notice requirements in FED. R. CRIM. P. 42. See *Remington Rand Corporation-Delaware*, 830 F.2d at 1258. Rule 42(a) requires that notice be given "in open court, in an order to show cause, or in an arrest order." If the contempt occurs in open court, then notice is easy. For indirect cases like this one, the open-court option may not be available. In any case, the focus must be on notifying the alleged contemnor, rather than on the formalities of notification procedures. As a result, we have recognized that "'[t]he purpose of the notice is to inform the contemnor of the nature of the charges and enable the contemnor to prepare a defense.'" *American Fletcher Mortg.*, 688 F.2d at 519 (quoting *United States v. Powers*, 629 F.2d 619, 625 (9th Cir. 1980) (citations omitted)).

Here, the record contains no indication that Integral ever received notice of the contempt proceeding. All we have are summary allegations from its adversary in the transcript and in a motion, neither of which can substitute for proof of notice. The only hint of service in the record is a copy indicating that there was service on the ambassador from Belarus, which we discuss below. Although Autotech halfheartedly claims that it served Integral, the

latter denies receiving such service and no copy of the service was made part of the record.

Both FED. R. CIV. P. 4 and 5 require that service be filed with the court. See FED. R. CIV. P. 4(l) ("If service is not waived, the person effecting service shall make proof thereof to the court. If service is made by a person other than a United States marshal or deputy United States marshal, the person shall make affidavit thereof."); FED. R. CIV. P. 5 ("All papers . . . required to be served upon a party, together with a certificate of service, must be filed with the court within a reasonable time after service . . . ."). We discussed the requirement of Rule 5 in *Russell v. City of Milwaukee*, 338 F.3d 662 (7th Cir. 2003):

> Although the word "require" connotes that the filing of the certificate is mandatory, the rest of the Advisory Committee Note indicates that the purpose of the requirement is to aid the district court by creating a standard method of proof that service was made; there is no indication that the amendment was meant to remove completely a district court's discretion to find that service has been made when a party fails to file a certificate. The Advisory Committee Note states: "Having such information on file may be useful for many purposes, including proof of service if an issue arises concerning the effectiveness of the service. The certificate will generally specify the date as well as the manner of service . . . ."

*Id.* at 666. While the court there held that a certificate of service might not be necessary where service was not otherwise contested or where there was proof that it had been accomplished, it also noted that "[c]ertainly, if a paper filed with the court does not contain the required certificate of service, a court may disregard it." *Id.* Here, Autotech's assertion that Integral had notice is not supported by any record evidence—evidence that Autotech had the burden of supplying.

Autotech's attempt to serve Integral through the Belarusian embassy does not fill this gap. In fact, service through an embassy is expressly banned both by an international treaty to which the United States is a party and by U.S. statutory law. The Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, prohibits service on a diplomatic officer. See *Tachiona v. United States*, 386 F.3d 205, 222 (2d Cir. 2004) ("[W]e decline to construe the FSIA as a license to serve process on diplomatic and consular representatives, even as agents for private, non-immune entities."). This conclusion is reinforced by the fact that service of process on an ambassador is not authorized by the FSIA. See *Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250, 253 (7th Cir. 1993). In *Alberti*, we were referring to § 1608(a)(3), which allows for service "to be addressed and dispatched by the clerk of the court to the head of the ministry of the foreign state concerned." We noted that the House Report had stated, "A second means [of service], of questionable validity, involves the mailing of a copy of the summons and complaint to the diplomatic mission of the foreign state. Section 1608 precludes this method . . . . *Service on an embassy by mail would be precluded under this bill.*" *Id.* at 253 (quoting H.R. REP. 1487, 94th Cong., 2d Sess., reprinted in 1976 U.S.C.C.A.N. 6604, 6625 (emphasis added)). This is no less true where an instrumentality of a foreign state is involved.

In conclusion, there is no competent record evidence of proper service of the contempt motion on Integral. The only record of service was by a method that is not authorized under FSIA and is inconsistent with the Vienna Convention on Diplomatic Relations. This alone resolves both the question whether Integral may now attack the judgment (yes) and the question whether the judgment may stand (no).

B.  Writ of Execution

Although lack of proper notice is enough to dispose of the present appeal, we deem it useful to address Integral's alternative arguments, as these points could conceivably arise on remand. The first one we discuss is whether the writ of execution is valid. We review the questions of immunity from execution under the FSIA *de novo*. See *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1085-86 (9th Cir. 2007).

Prior to the enactment of the FSIA, the United States gave absolute immunity to foreign sovereigns from the execution of judgments. This rule required plaintiffs who successfully obtained a judgment against a foreign sovereign to rely on voluntary repayment by that State. *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002). The FSIA codified this practice by establishing a general principle of immunity for foreign sovereigns from execution of judgments: "[T]he property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609. This immunity extends to the instrumentalities of a foreign state. *Em Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007). On the other hand, in keeping with its general pattern, the FSIA also recognizes exceptions to this immunity, "modif[ying] the rule barring execution against a foreign state's property by 'partially lowering the barrier of immunity from execution so as to make this immunity conform *more closely* with the provisions on jurisdictional immunity in the bill.'" *Connecticut Bank of Commerce*, 309 F.3d at 252 (quoting H.R. REP. 94-1487 at 27 (1976) (emphasis added)). Although there is some overlap between the exceptions to jurisdictional immunity and those for immunity from execution and attachment, there is no escaping the fact that the

latter are more narrowly drawn. See *De Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984).

Subsections 1610(a) and (d) provide general exceptions to the immunity of a foreign state from execution of a judgment, while subsection 1610(b) adds additional exceptions for instrumentalities of a foreign state. See *Connecticut Bank of Commerce*, 309 F.3d at 253. In keeping with the FSIA's overall design, "[t]he protections applicable to assets of instrumentalities vary from those applicable to the assets of the foreign states themselves." *Em Ltd.*, 473 F.3d at 472. As the Second Circuit explained the difference:

> Under subsections 1610(a) and (d), assets of a foreign state can be attached only *if the assets sought to be attached* are "used for a commercial activity in the United States." But under subsection 1610(b), which concerns agencies and instrumentalities of foreign states, creditors may attach "*any property in the United States* of an agency or instrumentality of a foreign state engaged in commercial activity in the United States," 28 U.S.C. § 1608(b) (emphasis added).

*Em Ltd.*, 473 F.3d at 472-73; see also *Connecticut Bank of Commerce*, 309 F.3d at 252.

Even if the theoretical power to attach assets of Integral that are found within the United States exists (which is all that § 1610 promises), that is not enough to win the day for Autotech. Its effort to secure payment fell short on much more basic points. First is the question whether it identified any specific property on which it wished to execute its judgment. The FSIA says that immunity from execution is waived only for specific "*property*." As a result, in order to determine whether immunity from execution or attachment has been waived, the plaintiff must identify specific property upon which it is trying to act. *E.g.*, *Af-Cap, Inc.*, 383 F.3d at 367. A court cannot give a party a

blank check when a foreign sovereign is involved: property belonging to the sovereign itself, or a different instrumentality, may still enjoy immunity while property of the instrumentality that is in the case may not. The only way the court can decide whether it is proper to issue the writ is if it knows which property is targeted.

It is also of no small moment that the FSIA authorizes execution only against properties "in the United States." See *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992) ("It is true that section 1610 does not empower United States courts to levy on assets located outside the United States."); *Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp.*, 921 F.Supp. 1113, 1119 (S.D.N.Y. 1996) ("Under the FSIA, assets of foreign states located outside the United States retain their traditional immunity from execution to satisfy judgments entered in United States courts."); see also *Af-Cap, Inc.*, 383 F.3d at 367 ("[U]nder § 1610(a) of the FSIA, a court is prohibited from executing against the property of a foreign state unless that property is: (1) in the United States; and (2) used for commercial activity in the United States."). The FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world. We would need some hint from Congress before we felt justified in adopting such a breathtaking assertion of extraterritorial jurisdiction. See, *e.g.*, *Small v. United States*, 544 U.S. 385, 388-89 (2005) (noting "the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application"). As cases like *Pasquantino v. United States*, 544 U.S. 349 (2005), illustrate, the presumption against extraterritorial effect is not absolute or rigid. Nor, as *Small* acknowledged, is there some kind of "clear statement" rule under which extraterritorial

application follows only if Congress says so in no uncertain terms. If, however, as here, there is an absence of "statutory language, context, history, or purpose" indicating that Congress was legislating with the world in mind, the presumption is sound. *Small*, 544 U.S. at 391.

This is undoubtedly why, when considering whether the tax and royalty obligations owned by the Republic of Congo were exempt from immunity from execution under § 1610(a), the Fifth Circuit tried to identify whether the *situs* of those obligations was in the United States. *Af-Cap Inc.*, 383 F.3d at 371-73. In our case, Autotech frankly admitted that it intended to use the writ to levy against assets outside the United States. There is a procedure for doing so, but Autotech did not use it. If assets exist in another country, the person seeking to reach them must try to obtain recognition and enforcement of the U.S. judgment in the courts of that country. If that effort is successful, then those courts can use their powers to assure enforcement of the judgment. Here, not only did Autotech fail to identify any assets in the United States that Integral had, it freely admitted that it was not trying to reach any such assets. Under the circumstances, we must conclude that there was nothing that the writ of execution could validly reach.

C. Validity of the Contempt Judgment

Integral also asserts that Autotech failed to carry its burden of proof to show that it was in contempt of the Agreed Order. We review a district court's decision on a contempt motion for abuse of discretion and will not reverse "'unless the result was clearly erroneous or unless we find an abuse of discretion by the district court.'" *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir. 1993) (quoting *Laborers' Pension Fund v. Dirty Work Unltd., Inc.*, 919 F.2d 491, 494 (7th Cir. 1990)). On this

point, too, we find that Integral has the better of the argument.

"In order to prevail on a contempt petition, the complaining party must demonstrate by clear and convincing evidence that the respondent has violated the express and unequivocal command of a *court order*." *D. Patrick*, 8 F.3d at 460 (emphasis in original). Autotech got off on the wrong foot by failing to comply with the requirements set in the Local Rules of the Northern District of Illinois for this type of motion. Those rules require that "[t]he affidavit upon which [the] notice of motion or order to show cause is based shall set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby, and such evidence as to the amount of damages as may be available to the moving party." N.D. ILL. LOCAL RULE 18(A) (1997). In so doing, the local rules not only notify the alleged contemnor of the charges against her but also ensure that the party alleging contempt has entered competent evidence into the record.

Autotech did not submit the required affidavit with its motion for contempt. One consequence of this failure was that it neglected to provide enough information to carry its burden of proof. As we noted at the outset, the only proof Autotech submitted was the rather incoherent sentence in Vecher's letter, which said "While have business with ordinary buyers (by the way, Mr. Scornavacca is one of them) making a buying/selling contract with them is sufficient, moreover that in this case the volumes of purchases ordered are scanty and do not influence the situation at the market." No reasonable fact-finder could conclude that this statement clearly and convincingly showed that Integral was admitting that it was engaged in prohibited sales. It is impossible to know what the phrases "have business with ordinary buyers" or "making a buying/selling contract with them" mean and whether they refer to current or past behavior.

While Vecher's letter may be relevant to the question whether Integral violated its obligations under the Agreed Order, it is not sufficient on its own to sustain Autotech's burden.

Autotech also offered no evidence supporting any particular level for the contempt sanction. "Civil contempt sanctions are designed for the dual purpose of compelling compliance with a court order and compensating the complainant for losses caused by contemptuous actions." *Tranzact Tech., Inc. v. 1Source Worldsite*, 406 F.3d 851, 856 (7th Cir. 2005). The sanctions must relate to one of these two purposes:

> When the purpose of sanctions in a civil contempt proceeding is compensatory, a fine, payable to the complainant, must be based on evidence of actual loss. When the purpose is to make the defendant comply, the court must consider the "character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."

*South Suburban Housing Center v. Berry*, 186 F.3d 851, 854 (7th Cir. 1999) (quoting *United Mine Workers v. Gibbs*, 330 U.S. 258, 304 (1947)). The amount of the sanction must be supported in the record. See *id*. Here, the record was silent on this central point. Autotech asked for a sanction in the amount of $20,000 per day just because, as its lawyer put it, "in this original RICO [action] we had a complaint for $10 million which we dismissed . . . based upon this [global settlement] order. We're talking about millions of dollars of goods." The court reduced the fine to $5,000 per day because it thought that it would balloon out of control: "[a] hundred days and we're up to $20 million." Nowhere was there evidence of either the actual losses Autotech was suffering or what it might take to ensure Integral's compliance. Under the circumstances, it was

an abuse of discretion to find Integral in contempt and to set a fine of $5,000 per day.

## IV

In summary, we conclude that the district court had subject matter jurisdiction over both the original case and the contempt proceedings that grew out of it. For several reasons, we also conclude that Integral is entitled to appeal from the judgment in excess of $18 million against it for that alleged contempt. Finally, we conclude that the judgment cannot stand, because of flaws in service, the lack of specificity of the property to be covered by the writ of execution, and the lack of evidence supporting the finding of contempt and the amount of the judgment. We therefore VACATE the contempt judgment and the writ of execution and REMAND for further proceedings consistent with this opinion.

A true Copy:

      Teste:

 

                            _____

                            *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*