In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2805

JENNY RUBIN, et al.,

*Plaintiffs-Appellees*,

and

DEBORAH D. PETERSON, et al.,

*Intervenors-Appellees*,

*v.*

THE ISLAMIC REPUBLIC OF IRAN,

*Defendant-Appellant*,

and

FIELD MUSEUM OF NATURAL HISTORY and
UNIVERSITY OF CHICAGO, THE ORIENTAL INSTITUTE,

*Intervenors*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CV 9370—**Blanche M. Manning**, *Judge*.

ARGUED OCTOBER 26, 2009—DECIDED MARCH 29, 2011

Before BAUER and SYKES, *Circuit Judges*, and SIMON, *District Judge*.[*]

SYKES, *Circuit Judge*. The Islamic Republic of Iran appeals two orders issued in connection with a long-running effort to collect on a large judgment entered against it for its role in a 1997 terrorist attack. The plaintiffs are American citizens who were injured in a brutal suicide bombing in Jerusalem, Israel, carried out by Hamas with the assistance of Iranian material support and training. The victims obtained a $71 million default judgment against Iran in federal district court in Washington, D.C., and then registered that judgment in the Northern District of Illinois for the purpose of attaching two collections of Persian antiquities owned by Iran but on long-term academic loan to the University of Chicago's Oriental Institute. They also sought to attach a third collection of Persian artifacts owned by Chicago's Field Museum of Natural History. They contend that this collection, too, belongs to Iran but was stolen and smuggled out of the country in the 1920s or 1930s and later sold to the museum. Iran's appeal requires us to consider the scope and operation of § 1609 of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330(a), 1602-1611, which provides that a foreign state's property in the United States is immune from attachment unless a specific statutory exception to immunity applies.

---

[*] The Honorable Philip P. Simon, Chief Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

The district court held that the immunity codified in § 1609 is an affirmative defense personal to the foreign sovereign and must be specially pleaded. Because Iran had not appeared in the attachment proceeding, this ruling had the effect of divesting the collections of their statutory immunity unless Iran appeared and affirmatively asserted it. So Iran appeared and made the immunity claim. In response the plaintiffs served Iran with requests for discovery regarding *all* Iranian-owned assets located anywhere in the United States. Not surprisingly, Iran resisted, maintaining that such far-flung and open-ended discovery about its American-based property was inconsistent with the FSIA. The district court disagreed and ordered general-asset discovery to proceed. Iran appealed.

The district court's discovery order effectively rejected Iran's claim of sovereign immunity and is therefore immediately appealable under the collateral-order doctrine. The court's earlier order, which denied § 1609 immunity in the absence of an appearance by the foreign state, is also properly before this court. That order raises closely related questions about sovereign-property immunity and is revived for review by Iran's interlocutory appeal of the general-asset discovery order.

Both orders are seriously flawed; we reverse. The district court's approach to this case cannot be reconciled with the text, structure, and history of the FSIA. Section 1609 of the Act provides that "the property in the United States of a foreign state *shall*

be immune from attachment" *unless* an enumerated exception applies. (Emphasis added.) This section codifies the longstanding common-law principle that a foreign state's property in the United States is presumed immune from attachment. This presumptive immunity, when read with other provisions of the FSIA, requires the plaintiff to identify the specific property he seeks to attach; the court cannot compel a foreign state to submit to general discovery about all its assets in the United States. The presumption of immunity also requires the court to determine—sua sponte if necessary—whether an exception to immunity applies; the court must make this determination regardless of whether the foreign state appears.

## I. Background

This appeal has its roots in a vicious terrorist attack. On September 4, 1997, Hamas carried out a triple suicide bombing in the crowded Ben Yehuda Street pedestrian mall in Jerusalem. *See Campuzano v. Islamic Republic of Iran,* 281 F. Supp. 2d 258, 261 (D.D.C. 2003). Five bystanders were killed and nearly 200 were injured. Hamas claimed responsibility for the bombing, and Israeli police arrested two Hamas operatives who participated in the attack. *Id.* at 261-62. They and other members of their Hamas cell gave Israeli authorities information about the planning, financing, and execution of this act of terrorism. The two were later convicted of multiple counts of murder and attempted murder. *Id.*

The plaintiffs here—Jenny Rubin and her mother, Deborah Rubin; Stuart Hersh and his wife, Renay Frym; Noam Rozenman and his parents, Elena and Tzvi Rozenman; Daniel Miller; and Abraham Mendelson—are American citizens who were grievously wounded in the September 4, 1997 bombing or suffered severe emotional and loss-of-companionship injuries as a result of being closely related to those who were physically hurt. These victims filed suit against Iran in federal district court in Washington, D.C., alleging that Iran was responsible for the bombings as a result of the training and support it had provided to Hamas. *Id.* Jurisdiction was predicated on § 1605(a)(7) (1996) of the FSIA, and the district court consolidated the action with another suit filed by a separate group of victims of the bombing. *Id.* at 261. Iran was properly served but defaulted. Pursuant to the requirements of § 1608(e) of the FSIA, the district court held a three-day evidentiary hearing before issuing a default judgment against Iran for $71.5 million in compensatory damages.[1] *Id.* at 272-77.

---

[1] The victims also received an award of punitive damages against other defendants—senior Iranian officials—but this attachment proceeding involves only Iran itself. Liability against Iran and its officials was premised on § 1605(a)(7), read in conjunction with the "Flatow Amendment," 28 U.S.C. § 1605 note, to create a private cause of action against foreign sovereigns for acts of terrorism, including extrajudicial killings. In a separate case, the D.C. Circuit later held that no such private cause of action against foreign sover-
(continued...)

At this point the plaintiffs faced a problem familiar to Iran's judgment creditors: They had won a significant judgment but enforcement options were limited. A nation-wide search for attachable Iranian assets eventually led to Chicago and its rich collection of ancient artifacts housed in the city's major museums. The plaintiffs registered their judgment with the United States District Court for the Northern District of Illinois and served the University of Chicago's Oriental Institute and later the Field Museum of Natural History with a Citation to Discover Assets pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and chapter 735, section 5/2-1402 of the Illinois Compiled Statutes.[2] The plaintiffs identified three specific collections in the museums' possession that they sought to attach and execute against: the Persepolis and Chogha Mish Collections at the Oriental Institute, and the Herzfeld Collection at the Field Museum.[3]

---

[1] (...continued)
eigns (as opposed to individuals) exists. *See Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004). Congress responded by supplying a cause of action through the National Defense Authorization Act of 2008, Pub. L. No. 110-181, 122 Stat. 3, which amended this section of the FSIA. This history has no effect on the merits of this appeal.

[2] The Field Museum and the Oriental Institute have jointly briefed this appeal. We refer to them collectively as "the museums" unless the context requires otherwise.

[3] The Rubin plaintiffs are pursuing similar litigation against Boston-area museums that possess artwork owned by Iran. *See* (continued...)

The first two are collections of Persian antiquities recovered in excavations in the Iranian city of Persepolis in the 1930s and on the Chogha Mish plain in south-western Iran in the 1960s. Archaeologists from the University of Chicago led these excavations, and Iran loaned the artifacts to the Oriental Institute for long-term study and to decipher the Elamite writing that appears on some of the tablets included among the discoveries. The terms of the academic loan require the Oriental Institute to return the collections to Iran when study is complete. The Institute says it has finished studying the Chogha Mish Collection and is ready to return it to Iran pending resolution of a claim before the Iran-United States Claims Tribunal in the Hague.[4] Study of the Persepolis Collection is apparently ongoing, al-

---

[3] (...continued)
*Rubin v. Islamic Republic of Iran,* 456 F. Supp. 2d 228 (D. Mass. 2006).

[4] The Iran-United States Claims Tribunal was established in January 1981 under the terms of the Algiers Accords, which resolved the crisis precipitated by Iran's seizure of American hostages at the United States Embassy during the Iranian Revolution in 1979. *Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi,* 129 S. Ct. 1732, 1736 (2009). After the hostages were taken, President Carter blocked Iranian assets within the United States. In connection with the release of the hostages, the Algiers Accords restored the financial position of Iran to that which existed before the crisis. *Id.* The Tribunal adjudicates property claims between the two states and their nationals in accordance with the terms of the Algiers Accords. *Id.*

though the Institute says it has returned parts of this collection to Iran.

The third group of artifacts is known as the Herzfeld Collection, after the German archaeologist Ernst Herzfeld who worked on excavations in Persia for 30 years in the early twentieth century. *See* Wikipedia, Ernst Herzfeld, http://en.wikipedia.org/wiki/Ernst_ Herzfeld (last visited Mar. 10, 2011). The Field Museum purchased a set of prehistoric pottery, metalworks, and ornaments from Herzfeld in 1945. The plaintiffs contest the Field Museum's title; they claim that Iran owns this collection because Herzfeld stole the artifacts and smuggled them out of the country in the 1920s and 1930s. Iran, however, does not claim ownership of the Herzfeld Collection.

The plaintiffs alleged that these three collections are subject to attachment under two provisions in the FSIA: (1) the exception to § 1609 attachment immunity for "property in the United States of a foreign state . . . used for a commercial activity" where the underlying judgment "relates to a claim for which the foreign state is not immune," 28 U.S.C. § 1610(a)(7); and (2) the "blocked assets" provision of the Terrorism Risk Insurance Act of 2002 ("TRIA"), which provides that the blocked assets of a terrorist party or its agency or instrumentality are subject to execution to satisfy a judgment obtained under the FSIA's terrorism exception, Pub. L. No. 107-297, Title II, § 201(a), 116 Stat. 2322, 2337 (2002) (codified at 28 U.S.C. § 1610 note). The museums responded that the collections are immune from attachment under § 1609 of

the FSIA and that neither the commercial exception in § 1610(a)(7) nor the "blocked assets" provision of TRIA applies.

The plaintiffs moved for partial summary judgment, asking the court to hold that § 1609 immunity is an affirmative defense that only the foreign state itself can assert. This question first came before a magistrate judge, who issued a report and recommendation agreeing with the plaintiffs that § 1609 immunity is personal to the foreign state and must be affirmatively pleaded. The museums objected. The United States entered the fray, filing a statement of interest on the side of the museums. The district judge was not impressed and entered an order agreeing with the magistrate judge that the foreign state itself must specially plead § 1609 immunity.

Instead of taking an immediate appeal, the museums asked the court to certify the order for appeal under 28 U.S.C. § 1292(b), but other events in the litigation soon overtook this request. Two days before the museums filed their § 1292(b) motion, Iran appeared in the district court and asserted § 1609 attachment immunity. This dramatically altered the course of the proceedings. The plaintiffs promptly shifted their attention to Iran, seeking discovery not just on the three museum collections but on *all* Iranian assets in the United States. Since then, the plaintiffs and Iran have been embroiled in litigation concerning the proper scope of these discovery requests. The dispute spawned numerous motions, multiple rulings by the magistrate judge and the district court, and now this

appeal. We will not try to provide a complete account of what transpired below but instead offer the following summary.

After Iran made its appearance, the plaintiffs served it with a request for production of documents under Rule 34 and a notice of deposition under Rule 30(b)(6) of the Federal Rules of Civil Procedure. The document request had ten sections. The first nine sought materials relating to the Persepolis, Chogha Mish, and Herzfeld Collections. The tenth request was significantly more ambitious. In relevant part, it demanded that Iran turn over "[a]ll documents, including without limitation any communication or correspondence, concerning any and all tangible and intangible assets, of whatever nature and kind, in which Iran and/or any of Iran's agencies and instrumentalities has any legal and/or equitable interest, that are located within the United States . . . ." The Rule 30(b)(6) notice sought to depose an officer or agent designated by Iran to testify on its behalf regarding its assets in the United States.

Iran sought a protective order shielding it from these discovery requests and also moved for summary judgment seeking a declaration that the Persepolis, Chogha Mish, and Herzfeld Collections are immune from execution and attachment under the FSIA. The plaintiffs countered with a motion under Rule 56(f) of the Federal Rules of Civil Procedure requesting additional discovery before responding to Iran's summary-judgment motion. This motion was completely separate from the plaintiffs' earlier discovery requests under Rules 30(b)(6) and 34,

but it led to significant confusion regarding which discovery requests were actually on the table. In addition to the Rule 56(f) motion, the plaintiffs also separately moved to compel Iran to comply with its previous document requests under Rule 34 and its deposition notice under Rule 30(b)(6).

The magistrate judge eventually granted the plaintiffs' Rule 56(f) motion for additional discovery. The judge said the plaintiffs were entitled to the following discovery from Iran: (1) any documents relating to the three contested collections of Persian artifacts; (2) documents that might support the plaintiffs' theory that the Oriental Institute was effectively Iran's agent; and (3) a Rule 30(b)(6) deposition of an officer or agent authorized to testify on Iran's behalf. The magistrate judge also granted the plaintiffs' motion to compel, but only "[i]nasmuch" as the discovery was necessary for the plaintiffs to respond to Iran's request for partial summary judgment. Iran objected but was overruled by the district court.

The plaintiffs interpreted these rulings as compelling Iran to comply in full with all their discovery and deposition requests under Rules 30(b)(6) and 34. Iran read the orders much more narrowly and thought it was only required to produce discovery relating directly to its motion for summary judgment. In particular the parties disputed whether Iran was required to provide general-asset discovery. Iran sought clarification, or in the alternative, a protective order. The magistrate judge denied Iran's motion for a protective order and explicitly

ordered general-asset discovery to proceed. The district judge affirmed, dismissing Iran's concerns about sovereign immunity as "overblown." But the judge was laboring under a misapprehension; she said the plaintiffs were "not seeking general asset discovery about every conceivable asset of Iran's in the United States."

Of course, general-asset discovery was *precisely* what the plaintiffs were seeking and indeed what the magistrate judge had ordered. His order plainly stated that "Iran will comply with [the plaintiffs'] requests for general asset discovery[,]" and this holding was the focal point of Iran's objection before the district court. In a motion to reconsider, the plaintiffs noted the district judge's error. The judge then acknowledged the oversight and issued a one-page order compelling Iran to submit to the plaintiffs' requests for general-asset discovery. Iran appealed under the collateral-order doctrine and also sought review of the district court's earlier order declaring that § 1609 sovereign-property immunity must be asserted by the foreign state itself. We permitted the museums to intervene on appeal, and the United States appeared as an amicus in support of reversal.[5]

---

[5] After Iran filed this appeal, another group of judgment creditors against Iran was granted leave to intervene in the district court. The lead plaintiff in this group is Deborah Peterson. After intervening, the Peterson plaintiffs participated in this appeal. Their presence, however, has no bearing on the merits of the appeal.

## II. Discussion

## A. Appellate Jurisdiction

Before we address the merits, there is a threshold question about appellate jurisdiction—two questions, actually, because two interlocutory orders have been appealed: (1) the district court's general-asset discovery order; and (2) the court's earlier order rejecting § 1609 sovereign-property immunity in the absence of an appearance by Iran. Jurisdiction over the general-asset discovery order is a relatively straightforward matter. The jurisdictional analysis regarding the court's earlier order is slightly more complicated.

It is well-established that "as a general rule, an order authorizing discovery in aid of execution of judgment is not appealable until the end of the case." *In re Joint E. & S. Dists. Asbestos Litig.*, 22 F.3d 755, 760 (7th Cir. 1994). However, the order at issue here invades Iran's sovereign immunity, and it is equally well-established that orders denying claims of immunity may be immediately appealed under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Nixon v. Fitzgerald*, 457 U.S. 731, 742-43 (1982); *Empress Casino v. Blagojevich*, Nos. 09-3975 & 10-1019, 2011 WL 710467, at *5 (7th Cir. Mar. 2, 2011). This includes interlocutory orders denying claims of sovereign immunity under the FSIA. *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 576 n.2 (7th Cir. 1989); *Segni v. Commercial Office of Spain*, 816 F.2d 344, 347 (7th Cir. 1987).

It is true that *Segni* and *Rush Presbyterian* concerned a foreign state's *jurisdictional* immunity from suit under

28 U.S.C. § 1604, not *attachment* immunity under § 1609.[6]
But the Fifth Circuit has held that the denial of attach-
ment immunity under § 1609 of the FSIA may be im-
mediately appealed under the collateral-order doctrine,
*FG Hemisphere Assocs. v. République du Congo*, 455 F.3d
575, 584 (5th Cir. 2006), and we agree with this sensible
conclusion. There is no reason the collateral-order doc-
trine should apply any differently in cases raising the
attachment immunity of foreign-state property under
§ 1609 than in cases raising foreign-state jurisdictional
immunity under § 1604. The FSIA protects foreign sover-
eigns from court intrusions on their immunity in its
various aspects, and interlocutory appeal is appropriate
regardless of which form of immunity is at stake.
Because the district court's general-asset discovery order
effectively rejected Iran's claim of attachment immunity
under § 1609, we have jurisdiction to review it under
the collateral-order doctrine.

The question of appellate jurisdiction over the court's
earlier order is trickier. That order, too, had the effect of
denying a claim of attachment immunity under the FSIA.
The district court held that § 1609 immunity is an af-
firmative defense that can be asserted only by the

---

[6] In full, 28 U.S.C. § 1604 provides:

> Subject to existing international agreements to which the
> United States is a party at the time of enactment of this Act
> a foreign state shall be immune from the jurisdiction of
> the courts of the United States and of the States except
> as provided in sections 1605 to 1607 of this chapter.

foreign sovereign itself. Up to that point in the litigation, the museums were advancing the claim of attachment immunity, and because Iran had not appeared, the court's order effectively stripped the collections of their statutory immunity. The court's earlier order thus falls within the scope of the collateral-order doctrine and was immediately appealable.

But orders immediately appealable under the collateral-order doctrine are "final decisions" under 28 U.S.C. § 1291, and subject to exceptions not applicable here, must be appealed within 30 days of entry. *See* FED. R. APP. P. 4(a)(1)(A); 28 U.S.C. § 2107(a); *Otis v. City of Chicago*, 29 F.3d 1159, 1166-67 (7th Cir. 1994) (en banc). Rather than filing an immediate appeal, the museums asked the court to certify the order for interlocutory appeal under § 1292(b). This was unnecessary, for reasons we will explain in a moment. In the meantime Iran appeared, becoming the lead defendant, and the focus shifted to discovery disputes. The § 1292(b) motion apparently got lost in the shuffle. Although the motion was fully briefed, the district court didn't address it until after this appeal was filed; at that point the court simply dismissed it as moot.

In *Weir v. Propst*, 915 F.2d 283, 285 (7th Cir. 1990), we "clarif[ied] the relationship between the collateral-order doctrine and section 1292(b) certification in the recurrent setting of appeals from denial of immunity." We explained that a § 1292(b) certification is unnecessary for an appeal under the collateral-order doctrine; orders denying immunity are "appealable—without any of the

rigamarole involved in a 1292(b) appeal—under section 1291, by virtue of *Mitchell v. Forsyth*." *Id.* We also said that a request for § 1292(b) certification "may not be used to circumvent the time limitations on filing an appeal under section 1291." *Id.* The "deadlines in Rule 4(a) for appeals in civil cases apply to all appealable orders, including collateral orders, specifically orders denying immunity, . . . [and] [i]f the deadline is missed, the order is not appealable." *Id.* at 286. If that occurs, "[t]he defendant must then wait until another appealable order (normally, the final judgment) is entered, upon appeal of which he can challenge any interlocutory order that has not become moot." *Id.*

We reiterated this point in *Otis*, although in somewhat more sweeping terms: "[A] litigant entitled to appeal under the collateral order doctrine must act within 30 days and if this time expires without appeal must wait until the final judgment to pursue the issue." 29 F.3d at 1167. This passage in *Otis* relied on *Weir* and should be read with the earlier opinion. The failure to timely appeal an immunity order under the collateral-order doctrine does not necessarily postpone review until the end of the case; it postpones review until another appealable order is entered. This will usually be the final judgment, but not always. And here, there is "another appealable order," *Weir*, 915 F.2d at 286, not the final judgment, that has provided the next opportunity for review. The district court's general-asset discovery order rejected Iran's claim of sovereign immunity, and Iran's timely appeal of *that* order permits

review of the earlier—and closely related—immunity decision.[7]

This conclusion finds support in decisions from the Third and Fifth Circuits. *See In re Montgomery County*, 215 F.3d 367, 372 (3d Cir. 2000) (quoting *Weir*'s statement that when a collateral order is not timely appealed, "[t]he defendant must then wait until another appealable order (normally, the final judgment) is entered, upon appeal of which he can challenge any interlocutory order that has not become moot"); *Kenyatta v. Moore*, 744 F.2d 1179, 1186-87 (5th Cir. 1984) (interlocutory appeal that is not timely pursued can be revived upon entry of final judgment or some other appealable order); *but cf. Mille Lacs Band of Chippewa Indians v. Minnesota*, 48 F.3d 373, 375 (8th Cir. 1995) (deciding not to review earlier orders of the district court—whether or not they fell within the collateral-order doctrine—on interlocutory review of a later injunction because the earlier orders were not timely appealed and were not inextricably

---

[7] The museums cite *United States v. Michelle's Lounge*, 39 F.3d 684 (7th Cir. 1994), as support for the proposition that the court's earlier order may be reviewed with Iran's timely interlocutory appeal of the later collateral order. But *Michelle's Lounge* simply held that an unappealed collateral order can be reviewed following the entry of final judgment, *id.* at 692, an uncontroversial proposition not at issue in this case. *Michelle's Lounge* does not address the precise question presented here: Whether a collateral order that is not timely appealed is revived for review when a timely appeal is taken from a later collateral order.

linked to the injunction issue that was properly before
the court).

Moreover, in the particular circumstances of this case,
permitting review of the first immunity order as part of
Iran's appeal from the second reflects sound appellate
management, not an unwarranted expansion of the
scope of collateral-order review. Both orders raise im-
portant and closely related questions regarding the
scope and operation of the FSIA. Questions of foreign-
sovereign immunity are sensitive, and lower-court mis-
takes about the availability of immunity can have foreign-
policy implications. More particularly here, the district
court's refusal to consider § 1609 attachment immunity
without an appearance by the foreign state precipitated
Iran's appearance and led directly to the imposition of
the general-asset discovery order against it. The latter
order was timely appealed, and the two substantially
overlap.[8] Review of both orders now will clarify the
rest of the litigation. Iran's timely appeal of the court's
general-asset discovery order brings up the court's

---

[8] Iran's appearance did not moot the earlier order. Iran entered
the case only because the district court refused to consider the
question of § 1609 immunity unless Iran appeared and raised
it. Iran's appearance, in turn, exposed it to the general-asset
discovery requests and the court's order that it comply. Iran
would like to withdraw from this case but is inhibited from
doing so by the district court's holding that § 1609 attach-
ment immunity must be asserted by the foreign sovereign.
This is a sufficient continuing interest to support an ongoing
live controversy about the court's earlier order.

earlier order denying § 1609 attachment immunity unless Iran appeared.[9]

## B.  Attachment Immunity Under § 1609 of the FSIA

On the merits this appeal challenges the district court's interpretation of the FSIA. Our review is de novo. *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 749 (7th Cir. 2007).

The FSIA was enacted in 1976, but the doctrine of foreign-sovereign immunity developed at common law very early in our nation's history. *Samantar v. Yousuf*, 130 S. Ct. 2278, 2284 (2010); *Republic of the Phillipines v.*

---

[9]  The Supreme Court's recent decision in *Ortiz v. Jordan*, 131 S. Ct. 884 (2011), does not affect our conclusion. The issue in *Ortiz* was whether the denial of a motion for summary judgment based on qualified immunity could be appealed following a full trial on the merits. *Id.* at 888-89. The Supreme Court said "no." *Id.* at 893. The denial of a motion for summary judgment based on qualified immunity may be immediately appealed under *Mitchell v. Forsyth*, 472 U.S. 511 (1985), subject to the limitations of *Johnson v. Jones*, 515 U.S. 304 (1995); alternatively, the defense may be renewed and litigated at trial. The Court held in *Ortiz* that the failure to take an immediate appeal of the denial of immunity on summary judgment precludes review of that order following a trial on the merits; to obtain review of an immunity claim in that situation, the defendant must preserve it at trial in a motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. *Ortiz*, 131 S. Ct. at 892-93.

*Pimentel*, 553 U.S. 851, 865 (2008); *Republic of Austria v. Altmann*, 541 U.S. 677, 688-89 (2004). "For more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). Chief Justice Marshall's opinion in *The Schooner Exchange v. McFaddon*, 7 Cranch 116 (1812), articulated the general principle, and "[a]lthough the narrow holding of *The Schooner Exchange* was only that the courts of the United States lack jurisdiction over an armed ship of a foreign state found in our port, that opinion came to be regarded as extending virtual absolute immunity to foreign sovereigns." *Verlinden*, 461 U.S. at 486. The doctrine "is premised upon the 'perfect equality and absolute independence of sovereigns, and th[e] common interest in impelling them to mutual intercourse.' " *Pimentel*, 553 U.S. at 865 (quoting *Schooner Exchange*, 7 Cranch at 137); *see also Nat'l City Bank of N.Y. v. Republic of China*, 348 U.S. 356, 362 (1955) (Foreign-sovereign immunity is based on "reciprocal self-interest [] and respect for the 'power and dignity' of the foreign sovereign.").

Foreign-sovereign immunity "is a matter of grace and comity on the part of the United States," not a constitutional doctrine. *Verlinden*, 461 U.S. at 486. Accordingly, federal courts "consistently . . . deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Id.* Eventually, a "two-step procedure developed for resolving a foreign state's claim of sovereign

immunity, typically asserted on behalf of seized vessels." *Samantar*, 130 S. Ct. at 2284. The diplomatic representative of the foreign state would request that the State Department issue a "suggestion of immunity." *Id.* If the State Department did so, the court would surrender jurisdiction. *Id.* In the absence of a suggestion of immunity, however, the court would "'decide for itself whether the requisites for such immunity existed.'" *Id.* (quoting *Ex parte Republic of Peru*, 318 U.S. 578, 587 (1943)). To make this decision, the court "inquired 'whether the ground of immunity is one which it is the established policy of the [State Department] to recognize.'" *Id.* (quoting *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)). The process thus entailed substantial judicial deference to the Executive Branch whether the State Department issued a suggestion of immunity or not.

In practice the State Department would usually request immunity in all actions against friendly foreign sovereigns. *Samantar*, 130 S. Ct. at 2285; *Verlinden*, 461 U.S. at 486. That changed in 1952 when the State Department adopted a new "restrictive" theory of foreign-sovereign immunity. *Samantar*, 130 S. Ct. at 2285; *Verlinden*, 461 U.S. at 486. The "Tate Letter" (Jack B. Tate, Acting Legal Advisor to the Department of State, writing to the Attorney General) announced that foreign-sovereign immunity would thenceforward be "confined to suits involving the foreign sovereign's public acts, and [would] not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden*, 461 U.S. at 487.

This policy shift was not codified into law, and its implementation gave rise to some practical and political

difficulties as the State Department struggled to maintain a consistent standard for evaluating grants of immunity for foreign sovereigns. *Samantar*, 130 S. Ct. at 2285; *Altmann*, 541 U.S. at 690-91; *Verlinden*, 461 U.S. at 487. In 1976 Congress passed the FSIA for the purpose of providing a clear, uniform set of standards to govern foreign-sovereign immunity determinations. Under the FSIA, courts, not the State Department, decide claims of foreign-sovereign immunity according to the principles set forth in the statute. *See* 28 U.S.C. § 1602 (congressional findings and declaration of purpose); *Samantar*, 130 S. Ct. at 2285; *Altmann*, 541 U.S. at 691; *Verlinden*, 461 U.S. at 487-88.

For the most part, the FSIA codified the restrictive theory of sovereign immunity announced in the Tate Letter. *Samantar*, 130 S. Ct. at 2285; *Altmann*, 541 U.S. at 691; *Verlinden*, 461 U.S. at 488. The Act contains two primary forms of immunity. Section 1604 provides jurisdictional immunity from suit: "[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" except as otherwise provided in the Act. 28 U.S.C. § 1604. Section § 1609, the provision at issue here, codifies the related common-law principle that a foreign state's property in the United States is immune from attachment and execution:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act *the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.*

*Id.* § 1609 (emphasis added). The term "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id.* § 1603(a).

In keeping with the restrictive theory of foreign-sovereign immunity, the FSIA carves out certain exceptions to the jurisdictional immunity of foreign states described in § 1604 (*see* §§ 1605-1607) and the immunity of foreign-state property from attachment and execution described in § 1609 (*see* §§ 1610, 1611). Accordingly, under § 1604 foreign states and their agencies and instrumentalities are immune from suit unless statutory exception applies. Under § 1609 foreign-state property in the United States is likewise immune from attachment or execution unless an exception applies. Under the exceptions listed in §§ 1610 and 1611, property owned by a foreign state's instrumentalities is generally more amenable to attachment than property owned by the foreign state itself. *See id.* § 1610(a) (exceptions applicable to foreign-state property), (b) (exceptions applicable to foreign-instrumentality property); *see also* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE U.S. § 460 cmt. b.

In their underlying suit against Iran, the plaintiffs established jurisdiction via § 1605(a)(7), an exception to jurisdictional sovereign immunity for actions "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." 28 U.S.C. § 1605(a)(7) (repealed and reenacted as § 1605A(a)(1), Pub. L. No. 110-181, Div. A,

Title X, § 1083(a)(1), (b)(1)(A)(iii), Jan. 28, 2008, 122 Stat. 338, 341). In the execution proceeding, they relied on the following exception to § 1609 attachment immunity:

> (a) The property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State . . . if—
>
> > (7) the judgment relates to a claim for which the foreign state is not immune under section 1605A, regardless of whether the property is or was in-volved with the act upon which the claim is based.

*Id.* § 1610(a)(7). They also claimed that Iran's assets are attachable under § 201 of the TRIA as "blocked assets" of a terrorist party. Pub. L. No. 107-297, Title II, § 201(a), 116 Stat. 2322, 2337 (2002).

The district court did not address the applicability of either of these exceptions. Instead, the court held that the attachment immunity conferred by § 1609 is per-sonal to the foreign state, which must appear and af-firmatively plead it. When Iran made its appearance and specifically raised § 1609, the court continued to sidestep the immunity question and instead ordered general-asset discovery regarding *all* of Iran's assets in the United States, not just the three museum collections the plaintiffs identified in the attachment citations. Both of these orders are incompatible with the text, structure, and history of the FSIA, and also conflict with relevant precedent. We address the second order first.

### 1. The general-asset discovery order

Execution proceedings are governed by Rule 69(a) of the Federal Rules of Civil Procedure and "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." FED. R. CIV. P. 69(a)(1). Discovery requests in aid of execution may be made pursuant to either the federal rules or the corresponding rules of the forum state, *id.* Rule 69(a)(2), but either way, the FSIA plainly applies and limits the discovery process.

As a general matter, it is widely recognized that the FSIA's immunity provisions aim to protect foreign sovereigns from the burdens of litigation, including the cost and aggravation of discovery. *See Pimentel*, 553 U.S. at 865; *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003); *Rush-Presbyterian*, 877 F.2d at 576 n.2; *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990). This is consistent with the Supreme Court's treatment of other immunities—for example, the qualified immunity of governmental officials. *See, e.g.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1953 (2009) ("The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery." (quotation marks omitted)). A potential difficulty arises, however, when an asserted exception to immunity turns on disputed facts. The FSIA does not directly address the extent to which a judgment creditor may pursue discovery to establish that the property he is seeking to attach fits within one

of the statutory exceptions to the attachment immunity conferred by § 1609.[10]

In *Arriba Ltd. v. Petroleos Mexicanos*, the Fifth Circuit aptly took note of the "tension between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery." 962 F.2d 528, 534 (5th Cir. 1992). *Arriba* involved § 1604 *jurisdictional* immunity, but the same tension is present when *attachment* immunity under § 1609 is at stake. The district court's decision to order nationwide discovery of all Iranian assets fails to appreciate this basic point. That much is evident in the magistrate judge's rationale for the discovery order:

> By inquiring about Iran's assets generally, the Plaintiffs, and ultimately the Court, will be able to determine which of those assets fall within the domain of assets that are amenable to attachment and execution under the FSIA and TRIA. The Court will not limit the Plaintiffs' discovery requests to those categories of assets that are reachable under the FSIA and TRIA, allowing Iran to be the judge of which assets are immune before providing any discovery.

---

[10] The only section in the FSIA that directly addresses discovery is 28 U.S.C. § 1605(g). That provision allows the Attorney General, under certain circumstances, to stay any request for discovery against the United States in any action brought against a foreign state on the basis of the "terrorism" exception to § 1604, as defined in § 1605(a)(7).

That determination goes to the merits of the case and will be made by the Court alone.

*Rubin v. Islamic Republic of Iran*, No. 03 C 9370, 2008 WL 192321, at *15 (N.D. Ill. Jan. 18, 2008). The district judge adopted this reasoning in toto.

This approach is inconsistent with the presumptive immunity of foreign-state property under § 1609. As a historical matter, "[p]rior to the enactment of the FSIA, the United States gave absolute immunity to foreign sovereigns from the execution of judgments. This rule required plaintiffs who successfully obtained a judgment against a foreign sovereign to rely on voluntary repayment by that State." *Autotech*, 499 F.3d at 749. The FSIA "codified this practice by establishing a general principle of immunity for foreign sovereigns from execution of judgments," subject to certain limited exceptions. *Id.* The statutory scheme thus "modified the rule barring execution against a foreign state's property by '*partially* lowering the barrier of immunity from execution, so as to make this immunity conform more closely with the provisions on jurisdictional immunity.'" *Id.* (second emphasis omitted) (quoting *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002)).

Importantly here, the exceptions to attachment immunity are narrower than the exceptions to jurisdictional immunity: "Although there is some overlap between the exceptions to jurisdictional immunity and those for immunity from execution and attachment, there is no escaping the fact that the latter are more narrowly drawn." *Id.* We noted in *Autotech* that "[t]he

FSIA says that immunity from execution is waived only for specific '*property*.' As a result, in order to determine whether immunity from execution or attachment has been waived, the plaintiff must identify specific property upon which it is trying to act." *Id.* at 750. Under the FSIA "[t]he only way the court can decide whether it is proper to issue the writ [of attachment or execution] is if it knows which property is targeted." *Id.* In other words, "[a] court cannot give a party a blank check when a foreign sovereign is involved." *Id.*

As our discussion in *Autotech* makes clear, § 1609 of the FSIA codifies the common-law rule that property of a foreign state in the United States is *presumed* immune from attachment and execution. To overcome the presumption of immunity, the plaintiff must identify the particular foreign-state property he seeks to attach and then establish that it falls within a statutory exception. The district court's general-asset discovery order turns this presumptive immunity on its head. Instead of confining the proceedings to the specific property the plaintiffs had identified as potentially subject to an exception under the FSIA, the court gave the plaintiffs a "blank check" entitlement to discovery regarding *all* Iranian assets in the United States. This inverts the statutory scheme.

Three other circuits have addressed the question of discovery in the context of attachment proceedings against foreign-state property in the United States under the FSIA, and all have agreed that the court must proceed narrowly, in a manner that respects the statutory

presumption of immunity and focuses on the specific property alleged to be exempt. The Second, Fifth, and Ninth Circuits have repeated an identical message to the district courts: "'[D]iscovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.'" *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007) (quoting *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998)); *Conn. Bank of Commerce*, 309 F.3d at 260 n.10 (quoting *Arriba*, 962 F.2d at 534); *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1095-96 (9th Cir. 2007) (emphasis omitted) (quoting *Conn. Bank of Commerce*, 309 F.3d at 260 n.10).[11] We agree. Discovery orders that are broad in scope and thin in foundation unjustifiably subject foreign states to unwarranted litigation costs and intrusive inquiries about their American-based assets. One of the purposes of the immunity codified in § 1609 is to shield foreign states from these burdens.

The plaintiffs note that these decisions from other circuits took language from *Arriba*, 962 F.2d at 534, the Fifth Circuit case dealing with exceptions to § 1604 *jurisdictional* immunity, and adapted it to the context of *attachment* immunity under § 1609. They claim that broader

---

[11] In *Af-Cap* the district court had limited discovery on grounds unrelated to the FSIA. The Ninth Circuit affirmed and also concluded that the discovery limitations were consistent with the requirements of the FSIA. *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1096 (9th Cir. 2007).

discovery should be available under § 1609 than § 1604. This argument is based on their reading of § 1606 of the FSIA, which provides that if an exception to § 1604 jurisdictional immunity applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. The plaintiffs contend that once a court has exercised jurisdiction over a foreign sovereign and entered a judgment against it, § 1606 entitles them to the same broad discovery as any other litigant seeking to execute on a judgment under Rule 69(a). The critical error in this argument is that it mixes the scope of *liability* with the scope of *execution*. Although Iran may be found liable in the same manner as any other private defendant, the options for executing a judgment remain limited. That is the point of § 1609. It is true that §§ 1604 and 1609 provide different kinds of immunity to foreign sovereigns, but there is no reason to read § 1609 to allow for more intrusive discovery than its § 1604 counterpart. To the contrary, as we observed in *Autotech*, the exceptions to § 1609 attachment immunity are drawn more narrowly than the exceptions to § 1604 jurisdictional immunity.

The plaintiffs cite two cases as support for the general-asset discovery order. The first is *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992), which involved a contract dispute between an American company and Beijing Ever Bright Industrial Co., a company controlled by the People's Republic of China. The American company won a default judgment against Ever Bright on a breach-of-contract claim and then sought general discovery in order to identify Ever

Bright's assets; the district court authorized the discovery.
Ever Bright appealed and the Ninth Circuit affirmed.
*Richmark* is distinguishable from this case. Ever Bright
was an instrumentality of the People's Republic of
China, and the discovery order at issue in *Richmark* was
limited to Ever Bright's assets. As we have noted, the
immunity exceptions in the FSIA for property owned by
an *instrumentality* of a foreign state are much broader
than the exceptions for property owned by the foreign
state itself.[12] *See* 28 U.S.C. § 1610(a) (exceptions to immu-
nity of foreign-state property), 1610(b) (exceptions to
immunity for foreign-instrumentality property); *see also
Autotech*, 499 F.3d at 749-50. Even so, we held in
*Autotech* that a judgment creditor seeking to invoke an
exception to § 1609 immunity must first identify the
property on which it seeks to execute. *Id.*

---

[12] The commercial-activity exception in § 1610(b) allows a
judgment creditor to execute against any property of an agency
or instrumentality of a foreign state in the United States so
long as the agency or instrumentality has been found to have
engaged in commercial activity. On the other hand, § 1610(a),
the FSIA exception invoked in this case, allows execution
against the property of a foreign state in the United States
only if *that property* has been used for commercial activity. *See
Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d
737, 749-50 (7th Cir. 2007); RESTATEMENT (THIRD) OF THE
FOREIGN RELATIONS LAW OF THE U.S. § 460 cmt. b ("For pur-
poses of post-judgment attachment and execution, the [FSIA]
draws a sharp distinction between the property of states and
the property of state instrumentalities . . . .").

The plaintiffs also cite *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 177 (2d Cir. 1998), which affirmed an order permitting a judgment creditor to conduct general discovery against Rafidain Bank, an instrumentality of Iraq. *Rafidain Bank* is also distinguishable; as in *Richmark* the order in question authorized general discovery against an *instrumentality* of a foreign sovereign, not the foreign sovereign itself. Equally important, the Second Circuit authorized broad discovery so that the judgment creditor would have an opportunity to substantiate its claim that the defendant instrumentality of Iraq was the alter ego of the Central Bank of Iraq—a claim that if proven would have allowed the judgment creditor to pursue the assets of the Central Bank. Neither *Richmark* nor *Rafidain Bank* provide support for the discovery order in this case.[13]

Finally, the plaintiffs lodge a policy objection to restricting discovery to the particular foreign-state property sought to be attached. They maintain that limiting discovery in this way would effectively deny judgment creditors the opportunity to locate potentially

---

[13] The Restatement of Foreign Relations explains that the FSIA provides weaker immunity protection for the property of foreign-state instrumentalities because "instrumentalities engaged in commercial activities are akin to commercial enterprises." RESTATEMENT (THIRD) OF THE LAW OF FOREIGN RELATIONS OF THE U.S. § 460 cmt. b. But because "the primary function of [foreign] states is government . . . , their amenability to post-judgment attachment should be limited to particular property." *Id.*

attachable assets of the foreign state. This contention merits several responses.

First, it is an exaggeration to suggest that limiting discovery to the specific property identified for attachment completely forecloses the opportunity of judgment creditors to discover *any* attachable assets of the foreign-state judgment debtor. Targeted discovery regarding specifically identified assets may prove fruitful, and the plaintiff may in the end be permitted to execute on the specified property. It is true that limiting discovery to the specific property identified for attachment restricts the plaintiff's ability to use the coercive power of the court to identify *other* attachable foreign-state assets, but that is a consequence of the balance struck by the FSIA. Nothing in the statutory scheme prevents judgment creditors from using private means to identify potentially attachable assets of foreign states located in the United States. Moreover, the FSIA includes a provision for judgment creditors in certain cases to enlist the assistance of the Secretary of the Treasury and the Secretary of State in identifying and executing against the assets of a foreign sovereign. Section 1610(f)(2)(A) provides:

> At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A [enacted Jan. 28, 2008]) or section 1605A, the Secretary of the Treasury and the Secretary of State *should make every effort to fully, promptly, and effectively assist any judgment creditor or any court that has issued*

*any such judgment in identifying, locating, and executing against the property of that foreign state* or any agency or instrumentality of such state.

(Emphasis added.) The plaintiffs secured their judgment against Iran under § 1605(a)(7) and thus are eligible for this assistance from the United States.

There is no question that the attachment immunity codified in § 1609 of the FSIA has a cost, and that cost is borne primarily by Americans who have been injured in tort or contract by foreign states or their agencies or instrumentalities. The FSIA embodies a judgment that our nation's foreign-policy interests justify this particular allocation of legal burdens and benefits. Accordingly, we conclude that under the FSIA a plaintiff seeking to attach the property of a foreign state in the United States must identify the specific property that is subject to attachment and plausibly allege that an exception to § 1609 attachment immunity applies. If the plaintiff does so, discovery in aid of execution is limited to the specific property the plaintiff has identified. The general-asset discovery order issued in this case is incompatible with the FSIA.[14]

## 2. *The appearance order*

The foregoing discussion also highlights the flaws in the district court's earlier order in which the court

---

[14] In light of this holding, we need not consider Iran's alternative argument that the general-asset discovery order violates the Algiers Accords, 20 I.L.M. 224 (1981).

held that attachment immunity under § 1609 is an affirmative defense that can only be asserted by the foreign state itself. This ruling fails to give effect to the statutory text: "[T]he property in the United States of a foreign state *shall* be immune from attachment arrest and execution *except* as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609 (emphasis added). As we have explained, the statute cloaks the foreign sovereign's property with a presumption of immunity from attachment and execution unless an exception applies; under § 1609 *the property* is protected by immunity and may not be attached absent proof of an exception. It follows from this language that the immunity does not depend on the foreign state's appearance in the case. The immunity inheres in the property itself, and the court must address it regardless of whether the foreign state appears and asserts it.

Again, we can find helpful analogous principles in the operation of § 1604 jurisdictional immunity. The Supreme Court has confirmed that the FSIA's immunity from suit arises presumptively, and "even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act." *Verlinden*, 461 U.S. at 493-94 & n.20.[15] This conclusion is unsur-

---

[15] The district court justified its appearance ruling almost entirely on an out-of-context reading of a sliver of FSIA legislative history that appears in this footnote in the Court's opinion in *Verlinden.* Just before the sentence we have quoted above, the Court notes that "[t]he House Report on the [FSIA] states that
(continued...)

prising; the immunity conferred by § 1604 is jurisdictional. The Court in *Verlinden* read § 1604 together with a separate provision of the FSIA, codified at 28 U.S.C. § 1330(a), which provides:

> The district courts shall have original jurisdiction . . . of any . . . action against a foreign state as defined in section 1603(a) of this title as to any claim for relief . . . to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or any applicable international agreement.

28 U.S.C. § 1330(a); *Verlinden*, 461 U.S. at 493-94.[16]

---

[15] (...continued)
'sovereign immunity is an affirmative defense that must be specially pleaded.'" *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (quoting H.R. Rep. No. 94-1487, at 17 (1976)). But immediately after this reference, the Court says quite clearly that the House Report got this point wrong: "Under the Act, however, subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, 28 U.S.C. § 1330(a). Accordingly, even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act." *Id.* This footnote, read as a whole, does not support the district court's order. In a bit of charitable understatement, we have previously characterized this passage of FSIA legislative history as "not entirely accurate." *Frovola v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985).

[16] A complication arises when a foreign-state instrumentality has a questionable claim to jurisdictional immunity. *See, e.g.*,
(continued...)

Though not jurisdictional, the immunity conferred by § 1609 is similarly a default presumption, one that inheres in the property of the foreign state. When a judgment creditor seeks to attach property to satisfy a judgment obtained under the FSIA, the district court is immediately on notice that the immunity protections of § 1609 are in play. In particular, where the plaintiff seeks to attach property of the foreign state *itself*, immunity is presumed and the court must find an exception—with or without an appearance by the foreign state—not as a jurisdictional matter but to give effect to the statutory scheme. *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE U.S. § 460 cmt. b (explaining the distinction in the FSIA between the property of foreign states and the property of foreign-state instrumentalities).

---

[16] (...continued)

*Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*, 32 F.2d 195 (2d Cir. 1929) (The plaintiff, apparently a private corporation, was served with a counterclaim and then attempted to invoke foreign-sovereign immunity by claiming it was an instrumentality of Sweden.). In this situation, we have held that before a foreign instrumentality may be entitled to the presumption of immunity under § 1604, it must establish a prima facie case that it fits the FSIA's definition of a foreign state. *See, e.g., Enahoro v. Abubakar*, 408 F.3d 877, 882 (7th Cir. 2005). However, when the plaintiff sues the foreign sovereign itself, the immunity issue is uncomplicated; immunity is presumed, and the court must find an exception with or without an appearance by the foreign state.

This reading of § 1609 is confirmed by several provisions in § 1610 governing exceptions to attachment immunity. For example, § 1610(a)(1) states that § 1609 immunity does not apply where "the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication." This strongly suggests that immunity from execution is presumed and waiver of immunity is the exception.[17] Section 1610(c) is even more telling. That provision governs the issuance of an attachment order under either § 1610(a) or (b) when the foreign state is in default:

> No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter [governing service, time to answer, and default].

28 U.S.C. § 1610 (c). The waiting period required by § 1610(c) ensures that a defaulting foreign state is provided adequate notice before an attachment order issued under either § 1610(a) or (b)—the "commercial" exceptions to § 1609 immunity—will take effect. This

---

[17] We have previously rejected the notion that a foreign state's failure to make an appearance before the court could itself constitute an implicit waiver of sovereign immunity. *See Frolova*, 761 F.2d at 378.

provision makes it clear that even when the foreign state fails to appear in the execution proceeding, the court must determine that the property sought to be attached is excepted from immunity under § 1610(a) or (b) before it can order attachment or execution.

Our conclusion that the court must address § 1609 immunity even in the absence of an appearance by the foreign state is also consistent with the common-law practice that the FSIA codified. As we have explained, the attachment immunity of foreign-state property, like the jurisdictional immunity of foreign states, was historically determined without regard to the foreign state's appearance in the case. The court either deferred to the State Department's suggestion of immunity or made the immunity determination itself, by reference to the State Department's established policy regarding foreign-sovereign immunity. *See Republic of Mexico v. Hoffman*, 324 U.S. 30, 35-36 (1945) (common-law doctrine of foreign-sovereign immunity required judicial deference to executive determinations of immunity because "[t]he judicial seizure" of the property of a foreign state may be regarded as "an affront to its dignity and may . . . affect our relations with it"). This practice continued after the issuance of the Tate Letter and the State Department's shift to the restrictive theory of foreign-sovereign immunity.

To date, two circuits have addressed whether the foreign state must appear and assert § 1609 attachment immunity, and both have concluded that the answer is "no." In the most recent case, the Peterson plaintiffs (who

have intervened here) sought to execute their judgment against certain Iranian receivables; the Ninth Circuit concluded that the district court must independently raise and decide whether the property is immune from attachment under § 1609. *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1126-28 (9th Cir. 2010). Similarly, the Fifth Circuit has held that "the [foreign state's] presence is irrelevant" to the question whether the property the plaintiff seeks to attach is excepted from § 1609's presumptive immunity. *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 233 (5th Cir. 2004). A district court in Massachusetts also agrees. *See Rubin v. Islamic Republic of Iran*, 456 F. Supp. 2d 228, 231-32 (D. Mass. 2006) (execution proceeding brought by the Rubin plaintiffs to attach property in the possession of a museum at Harvard University but alleged to belong to Iran).

We now join these courts in concluding that under § 1609 of the FSIA, the property of a foreign state in the United States is presumed immune from attachment and execution. The immunity inheres in the property and does not depend on an appearance and special pleading by the foreign state itself. The party in possession of the property may raise the immunity or the court may address it sua sponte. Either way, the court must independently satisfy itself that an exception to § 1609 immunity applies before ordering attachment or other execution on foreign-state property in the United States.

For the foregoing reasons, we REVERSE the district court's general-asset discovery order and its earlier order requiring Iran to appear and affirmatively plead

§ 1609 immunity, and REMAND for further proceedings consistent with this opinion.